09-2821-cv
*DiFolco v. MSNBC Cable L.L.C.*

# UNITED STATES COURT OF APPEALS
# FOR THE SECOND CIRCUIT

August Term 2009

Docket No. 09-2821-cv

Submitted: May 6, 2010                    Decided: October 7, 2010

_____

CLAUDIA DiFOLCO,

                              Plaintiff-Appellant,

        - v.-

MSNBC CABLE L.L.C., RICK KAPLAN, and SCOTT LEON,

                              Defendants-Appellees,

        - v.-

CASSANDRA BROWNSTEIN,

                              Defendant.*

_____

Before:  MINER and LYNCH, Circuit Judges, and TRAGER, District Judge.**

        Appeal from so much of an order entered in the United States District Court for the Southern District of New York (Preska, Ch. J.) as dismissed, for failure to state a claim pursuant to Fed. R. Civ. P. 12(b)(6), causes of action for breach of contract, violation of the New York Labor Law, defamation, and tortious interference with prospective business relations, the District Court having determined, inter alia, that:  plaintiff-

---

   * The Clerk of Court is directed to amend the official caption in this case to conform to the listing of the parties above.

   ** The Hon. David G. Trager of the United States District Court for the Eastern District of New York, sitting by designation.

appellant, a T.V. entertainment reporter, correspondent and anchor repudiated her contract with defendant appellant MSNBC and therefore could not prevail on her breach of contract or New York Labor Law claims; two of the three defamation claims were barred by the defense of truth and the third consisted of non-actionable opinion; and the tortious interference claim failed for reliance on the defamation claims as the wrongful acts giving rise to it.

Affirmed in part, vacated in part, and remanded in part.

SCOTT BROWNING GILLY (Gregory N. Filosa, on the brief), Thompson, Wigdor & Gilly, LLP, New York, New York, for Plaintiff-Appellant.

JULIE RIKELMAN, NBC Universal, Inc., New York, New York, for Appellee.

MINER, Circuit Judge:

Plaintiff-appellant Claudia DiFolco ("DiFolco") appeals from so much of an order entered on March 30, 2007, in the United States District Court for the Southern District of New York (Preska, Ch. J.), as dismissed, for failure to state a claim pursuant to Fed. R. Civ. P. 12(b)(6), her causes of action for breach of contract (and related New York Labor Law violations), defamation, and tortious interference with prospective business relations. The causes of action pleaded arose out of DiFolco's employment by defendant-appellee MSNBC L.L.C. ("MSNBC") as an entertainment reporter, correspondent, and anchor. Defendant-appellee Rick Kaplan ("Kaplan") was President of MSNBC and defendant-appellee Scott Leon ("Leon") was an Executive Producer at MSNBC.[1]

In dismissing the causes of action, the District Court determined, inter alia, that: DiFolco repudiated her contract with MSNBC and therefore could not prevail on her breach of contract or New York Labor Law claims; two of the three defamation claims were barred by the defense of truth, and the third consisted of non-actionable opinion; and the tortious interference claim failed for reliance on the defamation claims as the wrongful acts giving rise to it. See DiFolco v. MSNBC Cable, No. 06 Civ. 4728 (LAP), 2007 WL 959085, at *3–4, 5, 8 (S.D.N.Y. March 30, 2007). For the reasons that follow, we affirm in part, vacate in part, and remand in part as to so much of the order of the District Court as is the subject of this appeal.

---

[1] Cassandra Brownstein, a Producer at MSNBC and named as a party in the case, never was served, was dismissed from the action by order of the District Court, and is no longer is a party.

3

## BACKGROUND

### I.     The Course of Employment

DiFolco and MSNBC entered into a two-year employment agreement on December 2, 2004. The written agreement, signed on behalf of MSNBC by Kaplan, provided that the two-year term would commence on January 17, 2005. DiFolco, designated in the agreement as "Artist," agreed to employment "as an anchor/co-anchor, commentator, correspondent, reporter and/or analyst and in any other like capacity for MSNBC." With regard to the period of employment, the agreement provided as follows:

> The term hereof shall be divided into two (2) consecutive cycles of fifty-two (52) weeks each. MSNBC shall have the right to terminate this Agreement effective at the end of the first cycle by giving Artist written notice not less than sixty (60) days prior to the end of such cycle. This Agreement shall automatically terminate at the end of the second cycle without notice, unless the parties agree otherwise.

The Agreement established DiFolco's compensation during the two cycles as well as other terms and conditions of employment, including those contained in an attachment designated "Standard Provisions."

DiFolco asserts that she was first hired to be the Los Angeles-based correspondent for two new entertainment shows — "MSNBC at the Movies" and "MSNBC Entertainment Hot List." As such, she was responsible for conducting interviews and covering entertainment events. During the course of her employment she filled in as host on the shows and appeared on other MSNBC programs as well. DiFolco alleges in her complaint that she

4

performed all of her professional obligations in an exemplary manner, attended every shoot for which she was scheduled, traveled between the two coasts for MSNBC assignments (at her own expense without reimbursement by the Company), and always made herself available for and completed the work requested of her to the satisfaction of MSNBC and her managers.

Despite her close attention to the performance of her assigned duties, DiFolco alleges that she was "subjected to repeated mistreatment and abuse that created intolerable working conditions." She asserts in effect that Leon, her Executive Producer, and Cassandra Brownstein, her Producer, conspired to make her life miserable: that they "began a concerted pattern of harassing Ms. DiFolco, including repeatedly cancelling Ms. DiFolco's scheduled shoots without justification or notice to Ms. DiFolco, in order to further damage her reputation and career with the Company." Leon became especially irate after Kaplan requested that she do some work on a prime time program despite the fact that there would have been no interference with the existing shows. According to DiFolco, Leon went to far as to falsely report that she missed a shoot while testing for the prime time show. Moreover, Leon never responded to DiFolco's email regarding her harassment by Brownstein, including Brownstein's alleged misrepresentation regarding the timing of seven voiceovers.

II.    Termination of Employment — the Allegations

In an e-mail dated August 23, 2005, DiFolco requested a meeting with Kaplan, proposing a date the following week when she would travel to New Jersey for the meeting. The following allegations of the complaint pertain to the contents of that email and to the correspondence that followed:

5

38. While she expressed her hopes to have maintained a productive working relationship with the Company and "be a part of [Kaplan's] team for a long time to come," Ms. DiFolco realized the Defendants Leon and Brownstein continued to cancel her shoots and force her off the air. As such, she indicated to Defendant Kaplan that they should "discuss [her] exit from the shows." This was Ms. DiFolco's way of expressing to Kaplan her desire not to disrupt the shows on which she worked.

39. Defendant Kaplan agreed to meet with her as proposed to further discuss the matters raised in her email.

40. That same day, Ms. DiFolco informed Defendant Leon that she planned to meet with Defendant Kaplan on September 1, 2005. She also stated that she hoped to record the shows for early September out of New Jersey since she had to be in New York to cover "Fashion Week," noting that it would save the Company time and money on airfare if she simply remained on the East coast for that entire time period. Defendant Leon agreed to this arrangement.

41. The next day, on August 24, 2005, Defendant Leon responded by abruptly informing her that they "decided to change the direction of the fashion week coverage" and planned to send the New York Times style editor to cover the shows instead of Ms. DiFolco.

42. Ms. DiFolco immediately contacted Defendant Kaplan, forwarding Defendant Leon's most recent example of his ongoing effort to force her off the air and asked to know why she was being taken off the scheduled shoots. She specifically inquired whether Defendant Kaplan had made Defendant Leon aware of her previous request for a meeting, fearing that Defendant Leon had canceled her participation in Fashion Week in retaliation for approaching his superior and that her email would be misinterpreted.

43. Ms. DiFolco clearly expressed that "[she] did not resign yesterday" and confirmed their agreed meeting scheduled for September 1, 2005.

44. Defendant Kaplan acknowledged that he made Defendant Leon aware of her previous email. His email stated, "My complete impression is that you have resigned," and then continued, "sooner is better since your obvious intent is to leave."

6

45. While Ms. DiFolco was in flight from California, Defendant Leon left her a voicemail message that her meeting with Kaplan was canceled. At the same time, Defendant MSNBC sent Ms. DiFolco a proposed separation and release agreement through her agent, claiming that she had resigned.

DiFolco claims that the termination of her employment in the manner alleged constituted a material breach of her employment agreement, giving rise to her claim for the balance of the wages and other payments due to her and her corresponding claim brought under the New York Labor Law §§ 190–199-A.

III. Defamation

Following the termination, according to the complaint, "one or more of Defendants began making . . . defamatory statements about Ms. DiFolco on the Internet and to various media outlets." These statements, which included claims that "DiFolco had resigned, broken her contract and/or deserted her co-anchor," were allegedly "made by, with the participation of and/or under the authority and direction of one or more of Defendants." Three television industry websites were involved. An Internet website known as "Inside Cable" stated that DiFolco had resigned from MSNBC "in the middle of her contract," and a website known as "NewsBlues" stated that "[l]uscious Claudia DiFolco has quit MSNBC in the middle of her contract, leaving Sharon Tay as the sole host of 'Entertainment Hotlist' and 'At the Movies.'" DiFolco claimed that these statements "could only have originated from MSNBC officials given the confidential nature (up to that point) of her contract dispute." It is alleged that "Inside Cable" and "NewsBlues" reach over 80,000 individuals.

7

DiFolco also claimed that defendants caused a defamatory message about her to be posted, under the alias "Jill Journalist" on the website "TVSpy," on or about September 4, 2005. DiFolco claims that TVSpy reached over 80,000 individuals affiliated with the television industry. The message stated that DiFolco "believe[d] that cleavage, over time [sic] in the makeup chair and a huge desire to become a star is . . . how to pay your dues." The message also stated that "throughout her irrelevant career at MSNBC, she constantly ignored directions from news producers during live shots, refused to do alternate takes for editing purposes, pouted like a spoiled child and never was a team player."

IV.     Proceedings in the District Court

The motion to dismiss the complaint was filed by defendants on June 27, 2006, following the removal of the case from New York State Supreme Court, New York County, by Notice of Removal filed on June 20, 2006. The complaint included a "First Cause of Action" for Breach of Contract; a "Second Cause of Action" for Breach of the Implied Covenant of Good Faith and Fair Dealing; a "Third Cause of Action" for Tortious Interference with Contractual and/or Prospective Business Relations; a "Fourth Cause of Action" for Defamation and/or Slander Per Se; and a "Fifth Cause of Action" for Violation of the New York Labor Law." Following the removal of the action, DiFolco filed a motion to remand to the state court, which the District Court denied.

Following submissions by both sides, the District Court, by Memorandum and Order dated March 30, 2007, addressed motions: by all defendants to dismiss the complaint for failure to state a claim; by defendants Kaplan and Brownstein to dismiss for

8

lack of personal jurisdiction; by defendant Brownstein to have the claims against her dismissed for insufficient service of process; and by DiFolco to transfer venue to the District of New Jersey if the court found a lack of personal jurisdiction over the individual defendants. See DiFolco, 2007 WL 959085, at *1. The District Court dismissed the claims against Brownstein for failure to serve her with process; determined that the court had personal jurisdiction over Kaplan; and denied DiFolco's motion to transfer venue to the District of New Jersey as moot, since the court found that it had personal jurisdiction over all remaining defendants. See id. at *8–10.

As to the motion to dismiss for failure to state a claim, the District Court concluded that DiFolco had repudiated her contract in an exchange of emails and, therefore, that MSNBC had no financial obligations to DiFolco under the terms of her contract. In reaching that conclusion, the District Court found that the contract was "unambiguous in its requirement that [DiFolco] be at MSNBC's disposal for a two-year period" and that "[p]laintiff's 8/23 email is equally unambiguous in expressing [DiFolco's] intention to leave before the completion of said period." Id. at *3. After referring to another email, dated August 31, the court determined that "[b]oth of these emails from [DiFolco] constituted repudiation of the contract and relieved MSNBC of future obligations." Id. Although the District Court noted that DiFolco sought an unspecified amount of damages for extra work and travel expenses predating the repudiation, the court determined that the failure to pay these amounts did not add up to a material breach of the contract and therefore dismissed the breach of contract claim in all

9

respects. Id. at *4.

With respect to DiFolco's claim of breach of the covenant of good faith and fair dealing, the District Court took note of defendant's argument that this claim was precluded by the breach of contract claim. The court acknowledged that New York Law does not recognize a separate claim for breach of the covenant of good faith and fair dealing based on the same facts as a claim for breach of contract, although the Federal Rules of Civil Procedure allow the claims to be pleaded in the alternative. In any event, the District Court found that the breach of the covenant of good faith and fair dealing claim was properly pleaded and denied dismissal of that claim with the following rationale: "In that the breach of contract claim is dismissed, the question of preclusion by that claim is now moot." Id. at *4.

Addressing the defamation claim, the District Court observed that the postings on the first two websites ("Inside Cable" and "NewsBlues") contained true information that DiFolco had resigned before the expiration of her contract. This observation rested on the court's previous finding that DiFolco had indeed repudiated her contract. Accordingly, the court concluded that the defamation claims founded on the first two postings were "not actionable." Id. at *5. The third posting ("Jill Journalist" on "TVSpy"), included statements relating to DiFolco's lack of professionalism. The defamation claim based on this posting was dismissed on the basis of the following finding by the District Court: "[A] reasonable reader would conclude from both the broader context and the immediate context that the third allegedly defamatory statement consists of opinions, not facts." Id.

10

at *8.

The District Court next addressed DiFolco's claim for tortious interference with prospective business relations and employed the following language in dismissing that claim:

> In oral argument on March 15, 2007, counsel stated that Plaintiff relied solely on defamation as the wrongful act predicating the claim of tortious interference. In that the defamation claim has been dismissed in its entirety, Defendants' motion to dismiss the claim of tortious interference with prospective business relations is granted.

Id.

By endorsement dated March 17, 2008, the District Court further addressed the breach of the fair dealing covenant claim, holding that DiFolco "may not . . . pursue the money remaining under her contract under a breach of implied covenant of fair dealing claim but may only pursue damages (and a claim) arising out of facts different from those upon which her breach of contract claim was based."

In a Notice and Order of Voluntary Dismissal dated May 22, 2009, DiFolco agreed to dismissal of the following claims with prejudice: breach of the implied covenant of good faith and fair dealing; New York Labor Law claims relating to appearance fees and unreimbursed expenses; claims for payment for additional program duties set forth in paragraphs 19 and 20 of the complaint; and claims for unpaid travel expenses as set forth in paragraph 21 of the complaint. By endorsement dated June 1, 2009, the District Court directed the Clerk to mark the action closed and to deny all pending motions as moot. This timely appeal followed. On appeal, DiFolco challenges the dismissal of her breach

11

of contract and related New York Labor law claims, and her defamation and tortious interference with business relations claims.

**ANALYSIS**

I.      <u>Stating a Claim — the Governing Law</u>

    A.      Required Allegations and the Standard of Review

The Federal Rules of Civil Procedure require that a claim for relief contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). A complaint may be dismissed to the extent that it "fail[s] to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). This Court reviews such a dismissal <u>de novo</u>. <u>See Bernheim v. Litt</u>, 79 F.3d 318, 321 (2d Cir. 1996) (citation omitted). In doing so, we are constrained to "'accept[] all factual allegations as true, and draw[] all reasonable inferences in the plaintiff's favor.'" <u>Shomo v. City of New York</u>, 579 F.3d 176, 183 (2d Cir. 2009) (quoting <u>Chambers v. Time Warner, Inc.</u>, 282 F.3d 147, 152 (2d Cir. 2002)). We are also constrained, however, to ascertain that the complaint "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" <u>Ashcroft v. Iqbal</u>, 129 S. Ct. 1937, 1949 (2009) (quoting <u>Bell Atl. Corp. v. Twombly</u>, 550 U.S. 544, 570 (2007)). In other words, a complaint is not required to have "detailed factual allegations, but it demands more than an unadorned, the defendant-unlawfully-harmed-me accusation." <u>Id.</u> at 1949 (internal quotation marks omitted). In its formulation of the <u>Twombly</u>-<u>Iqbal</u> requirements for a statement of claim, the Supreme Court has established the following order to be followed in determining

12

whether the pleading is adequate: "When there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." Id. at 1950 (emphasis supplied).

B.    Consideration of Matters Extraneous to the Complaint

In considering a motion to dismiss for failure to state a claim pursuant to Rule 12(b)(6), a district court may consider the facts alleged in the complaint, documents attached to the complaint as exhibits, and documents incorporated by reference in the complaint. Chambers, 282 F.3d at 153; Hayden v. County of Nassau, 180 F.3d 42, 54 (2d Cir. 1999). Where a document is not incorporated by reference, the court may neverless consider it where the complaint "relies heavily upon its terms and effect," thereby rendering the document "integral" to the complaint. Mangiafico v. Blumenthal, 471 F.3d 391, 398 (2d Cir. 2006) (quoting Chambers, 282 F.3d at 152–53). However, "even if a document is 'integral' to the complaint, it must be clear on the record that no dispute exists regarding the authenticity or accuracy of the document." Faulkner v. Beer, 463 F.3d 130, 134 (2d Cir. 2006). "It must also be clear that there exist no material disputed issues of fact regarding the relevance of the document." Id.

II.    DiFolco's Statements of Claims Examined

A.    The Contract Claim

DiFolco's complaint on its face clearly alleges a breach of her employment contract with MSNBC. In brief, she alleges that she was subjected to intolerable working conditions and that she was fired when she complained about the conditions. She also

13

asserts that defendants improperly interpreted certain of her e-mails as notices of resignation. The District Court referred to e-mails from DiFolco that were said to be incorporated by reference in the complaint in concluding that DiFolco did indeed repudiate her contract by resignation and therefore that the complaint failed to state a claim upon which relief could be granted. The District Court referred to those e-mails dated August 23 and August 31in arriving at a conclusion that "[b]oth of these e-mails from Plaintiff constituted repudiation of the Contract and relieved MSNBC of future obligations" DiFolco, 2007 WL 959085, at *3.

Under New York law

> "[a] repudiation can be either a statement by the obligor to the obligee indicating that the obligor will commit a breach that would of itself give the obligee a claim for damages for total breach' or a 'voluntary affirmative act which renders the obligor unable or apparently unable to perform without such a breach."

Norcon Power Partners, L.P. v. Niagara Mohawk Power Corp., 705 N.E.2d 656, 659 (N.Y. 1998) (quoting RESTATEMENT [SECOND] OF CONTRACTS § 250) (citing II Farnsworth, Contracts § 8.21; UCC § 2-610, Comment 1 (2001)). However, a repudiation can be determined to have occurred only when it is shown that "the announcement of an intention not to perform was positive and unequivocal." Tenavision, Inc. v. Neuman, 379 N.E.2d 1166, 1168 (N.Y. 1978); see also De Lorenzo v. BAC Agency, Inc., 681 N.Y.S.2d 846, 848 (App. Div. 1998) (indicating that repudiation occurs where "the repudiating party has indicated an unqualified and clear refusal to perform"); Rachmani Corp. v. 9 E. 96th St. Apt. Corp., 629 N.Y.S.2d 382, 385 (App. Div. 1995)

14

(explaining that repudiation occurs when there is "a definite and final communication of the intention to forego performance").

Generally, "[t]he issue of repudiation or abandonment is an issue of fact." Bercow v. Damus, 776 N.Y.S.2d 289, 290 (App. Div. 2004). An exception applies where the repudiation is in writing, in which case the court may resolve the issue of repudiation "as a matter of law." See York Agents, Inc. v. Bethlehem Steel Corp., 318 N.Y.S.2d 157, 158–59 (App. Div. 1971). Even if the repudiation is in writing, however, where the written expressions are ambiguous as to their meaning, "then such determination [i.e., repudiation] is to be made by the jury." Hartford Acc. & Indem. Co. v. Wesolowski, 33 N.Y.2d 169, 172 (1973).

Because DiFolco referred in her complaint to her e-mails to Kaplan of August 23, 2005, and August 24, 2005, the District Court could deem them incorporated in the complaint and therefore subject to consideration in its review of the adequacy of the complaint. Although DiFolco wrote in her e-mail of August 23 that she wished to "discuss [her] exit from the shows" and to give MSNBC "ample time to replace [her]," these statements can be taken as indicative of her desire to get out from under the direction of the people with whom she had problems rather than leaving MSNBC altogether. Also, her statement that she wanted to "be a part of [MSNBC's] team for a long time to come" and that she asked for a meeting with Kaplan to discuss matters further may point in the direction of her desire to continue employment on a different level. DiFolco's e-mail to Kaplan on the very next day, August 24, in which DiFolco

15

inquired about the cancellation of her fashion week assignment, included the following:

> [T]o be clear, I did not resign yesterday and was really giving you significant notice of my intention so you could begin thinking about alternatives for next year. [A]s always, count on my continued professionalism.

Kaplan's e-mail response of August 28, 2005, ignored the foregoing altogether and stated the following: "My complete impression is that you had resigned . . ." and "your obvious intent is to leave." Kaplan may well have put this "spin" on the earlier e-mail in an attempt to rid MSNBC of an employee he considered troublesome.

In any event, we do not agree with the District Court that "[p]laintiff's 8/23 e-mail is . . . unambiguous in expressing [DiFolco's] intention to leave," DiFolco, 2007 WL 959085, at *3, as a matter of law. There are at least factual issues as to whether DiFolco had made a final and definite communication of an intent to forego performance or had indicated her refusal to perform in a clear and unqualified way such as to justify a conclusion that she had repudiated her contract.

As further support for its conclusion that DiFolco had repudiated her contract, the District Court referred to an e-mail communication from DiFolco to Kaplan, dated August 31, 2005, see id., following Kaplan's August 28 e-mail that included language that it would be "[b]est for all" that DiFolco leave "quickly" and that "sooner is better." The August 31 e-mail was not attached to the complaint, was not incorporated by reference in the complaint, and was not integral to the complaint. Neither was it relied upon in any way in DiFolco's claim for breach of contract. Moreover, it was sent after Kaplan's

16

August 24 e-mail setting forth his "complete impression" that DiFolco had resigned and terminated her employment. The District Court therefore erred in considering the August 31 e-mail.

Moreover, the August 31 e-mail was ambiguous as well. On the one hand, as the District Court noted, DiFolco wrote: "It was my intention to give you long-term notice that I was terribly disappointed in the way I was treated and was not planning on returning for the second year of my contract." On the other hand, DiFolco wrote in the same e-mail: "So we went from your agreement to meet with me to discuss the issues to you having a 'complete impression' of my resignation, which was never given. . . . Even if you were unclear from my original e-mail, . . . what part of 'I did not resign yesterday and was merely giving you significant notice of my intention so you could begin thinking about alternatives for next year' in my follow-up did you not understand? No notice was given, no formal letter of resignation was sent. No time frames were offered."

The August 31 e-mail is a lengthy one and cannot as a matter of law be said to manifest a clear and unequivocal repudiation. In ruling on a motion pursuant to Fed. R. Civ. P. 12(b)(6), the duty of a court "is merely to assess the legal feasibility of the complaint, not to assay the weight of the evidence which might be offered in support thereof." Cooper v. Parsky, 140 F.3d 433, 440 (2d Cir. 1998) (internal citation and quotation marks omitted). The District Court here "assay[ed] the weight of the evidence" of repudiation and improperly chose between reasonably competing interpretations. Because we find that a claim has been stated for a breach of contract and that repudiation

17

has not been established as a matter of law, we reinstate DiFolco's breach of contract claim as well as her corresponding claim brought pursuant to the provisions of New York Labor Law §§ 190–199-A for failure to pay wages.

B.     The Defamation Causes of Action

The District Court determined that two of the allegedly defamatory statements — the statement on the "Inside Cable" website that DiFolco had resigned from MSNBC "in the middle of her contract" and the statement on the "NewsBlues" website that Claudia DiFolco has quit MSNBC in the middle of her contract" — "[we]re true . . . and thus not actionable." DiFolco, 2007 WL 959085, at *5.  This determination was based on the court's conclusion that DiFolco repudiated her contract as a matter of law, a conclusion that we have rejected as premature.  Accordingly, we are constrained to reinstate the defamation claims, which are pleaded properly to state claims in any event.  The complaint alleges that the statements were untrue and defamatory and were published with malice and "with knowledge of their falsity and/or with a reckless disregard for their truth or falsity."  DiFolco further alleges that these statements were "willful" and "intended to seriously harm [her] . . . career."

According to the complaint, the defamatory statements "impugn Ms. DiFolco's honesty, trustworthiness, dependability, and professional fitness and abilities by falsely charging her with conduct that would tend to injure her in her trade or business."  These and other allegations in the complaint are adequate to support a claim based on a "writing which tends to disparage a person in the way of [her] office, profession, or trade."

18

Nichols v. Item Publishers, Inc., 132 N.E.2d 860, 862 (N.Y. 1956).  The complaint describes statements that, "if true, would tend to prove [DiFolco] unfit to continue [her] calling."  Id. (internal quotation marks and citations omitted).  The complaint sets forth the necessary elements to make out a claim for defamation in New York, including the element of malice.  See generally Liberman v. Gelstein, 605 N.E.2d 344, 349–50 (N.Y. 1992).

As to the third alleged defamatory statement — the TVSpy website statement that DiFolco relied on cleavage and makeup to advance her career, ignored directions, refused "alternate takes," pouted, and was not a team player — the District Court also was premature in its dismissal.  The District Court determined that "a reasonable reader would conclude from both the broader context and the immediate context that the third allegedly defamatory statement consists of opinions, not facts."  DiFolco, 2007 WL 959085, at *8.  However, "'[o]pinions based on false facts are actionable . . . against a defendant who had knowledge of the falsity or probable falsity of the underlying facts.'"  Davis v. Ross, 754 F.2d 80, 86 (2d Cir. 1985) (quoting Hotchner v. Castillo-Puche, 551 F.2d 910, 913 (2d Cir. 1977).  Such knowledge of falsity is properly alleged here, and DiFolco is entitled to show that the "negative characterization" presented on the website "is coupled with a clear but false implication that the author is privy to facts about the person that are unknown to the general reader."  Davis 754 F.2d at 85–86.

C.      The Tortious Interference with Prospective Business Relations Claim

In order to recover for tortious interference with prospective business relations, a

19

plaintiff must plead and prove:

> (1) business relations with a third party; (2) the defendant's interference with those business relations; (3) the defendant acted with the sole purpose of harming the plaintiff or used dishonest, unfair or improper means; and (4) injury to the business relationship.

Nadel v. Play-By-Play Toys & Novelties, Inc., 208 F.3d 368, 382 (2d Cir. 2000). Noting the statement of counsel "that Plaintiff relied solely on defamation as the wrongful act predicating the claim of tortious interference" and that it had dismissed the defamation claims, the District Court found no further basis for proceeding with the tortious interference claim and dismissed it for failure to state a claim. DiFolco, 2007 WL 959805, at *8. Our reinstatement of the defamation claim eliminates the District Court's rationale for dismissal of the tortious interference claim. However, our review of the District Court's 12(b)(6) rulings being de novo, "we are free to affirm the decision below on dispositive but different grounds." Primetime 24 Joint Venture v. Nat'l Broad. Co., 219 F.3d 92, 103 (2d Cir. 2000). We affirm the dismissal of tortious interference claim for the reasons given below.

In the third claim, entitled "Tortious Interference with Contractual and/or Prospective Business Relations," DiFolco alleges that "[d]efendants intentionally interfered with Plaintiff's professional relationships and opportunities for employment" and that "[d]efendants' actions permanently injured Plaintiff's business relationships in the [news and entertainment] industry." According to the complaint, these actions gave rise to damages flowing from harm to DiFolco's career development, economic harm in

20

the form of lost income and benefits, harm to her professional and personal reputation, and harm consisting of mental anguish and emotional distress.

Aside from the fact that these allegations are too conclusory, vague, and lacking in a factual basis to make out DiFolco's tortious interference claim, see Black Car and Livery Ins., Inc. v. H & W Brokerage, Inc., 813 N.Y.S.2d 751, 752 (App. Div. 2006), the complaint fails entirely to describe any third party with whom DiFolco had prospective business relations to be interfered with, see Nadel, 208 F.3d at 382–83. The lack of such an allegation is fatal to this claim.

III.    Conclusion

We affirm the judgment of the District Court as to the dismissal of the claim for tortious interference and vacate so much of the judgment as dismisses the causes of action for breach of contract (with related New York Labor Law claims) and defamation. We remand for further proceedings consistent with the foregoing.